UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUIS A. CIRELLI, JR.,<br><br>                Plaintiff<br><br>    v.<br><br>CITY OF WILDWOOD, NEW JERSEY;<br>ANTHONY LEONETTI, individually<br>and in the Wildwood Commissioner<br>of Public Safety; and STEVEN<br>STOCKS, individually and<br>as a member of the Wildwood<br>Beach Patrol,<br><br>                Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>Civil No. 13-05664(JEI/JS)<br><br><br>**OPINION** |

**APPEARANCES:**

HORNSTINE, PELLONI & HORNSTINE, LLC
By:  Louis F. Hornstine, Esq.
     Brian A. Pelloni, Esq.
1500 Walnut Street, Suite 300
Philadelphia, PA 19102
        Counsel for Plaintiff

RICHARDSON, GALELLA & AUSTERMUHL
By:  Allen E. Richardson, Esq.
142 Emerson Street
Woodbury, NJ 08096
     Counsel for Defendants

**IRENAS,** Senior District Judge:

    Plaintiff Louis A. Cirelli, Jr. filed an Amended Complaint

("Am. Compl.," Dkt. No. 14) against Defendant City of Wildwood,

New Jersey, Defendant Anthony Leonetti, individually and as the

Wildwood Commissioner of Public Safety, and Defendant Steven

Stocks, individually and as a member of the Wildwood Beach

Patrol ("WBP"), for terminating Plaintiff's position as WBP Chief after 48 years of employment.  Plaintiff alleges age discrimination, retaliation, and hostile work environment claims, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.*, and two state law claims for intentional infliction of emotional distress and negligent infliction of emotional distress.  Presently before the Court is Defendants' Motion for Summary Judgment ("DMSJ," Dkt. No. 23). The Court will grant the motion in part and deny it in part.

## I.   Relevant Facts

The City of Wildwood Beach Patrol employed Plaintiff for 48 years prior to terminating his employment on July 24, 2012. (Defs.' Statement of Material Facts, Dkt. No. 23-1 ("DSOF") ¶ 2; Pl.'s Supp. Statement of Disputed Material Facts, Dkt. No. 26-2 ("PSSOF") ¶¶ 1-2)  Plaintiff, who was at least 66 years old at the time of termination, had served as the "main supervisor and the number one officer on the beach patrol" since 1995.  (Pl.'s Resp. Statement of Material Facts, Dkt. No. 26-1 ("PRSOF")) ¶ 4; PSSOF ¶ 1 (quoting Cirelli Dep., Def. Ex. 1 at 16:9-23)).  He had never been reprimanded or disciplined prior to the events giving rise to this action.  (PSSOF ¶ 2)

Defendant Leonetti became the Commissioner of Public Safety and Plaintiff's immediate superior in 2011.  (DSOF ¶¶ 8-10)  The

parties disagree on the date, but either in May 2011, when Leonetti first met Plaintiff, soon after he became Commissioner (DSOF ¶ 14-15), or in January 2012, immediately prior to a budget meeting (PRSOF ¶ 14, PSSOF ¶ 6), Leonetti asked Plaintiff, "When are you going to retire?" (DSOF ¶ 15) Plaintiff responded that 2012 would be his 49th year on the beach patrol, and he would like to reach 50 years. (PRSOF ¶ 14, PSSOF ¶ 7; DSOF 15) Defendants indicate that "Leonetti responded that that was 'OK' with him" and that the conversation "was not adversarial," moving directly to a budget discussion afterward. (Defs.' Resp. to PSSOF, Dkt. No. 27-1 ("DRSOF") ¶ 6, DSOF ¶ 15) Plaintiff does not dispute these facts but characterizes the conversation as a "negative interaction," "not adversarial but challenging." (PRSSOF ¶¶ 14-15, PSSOF ¶¶ 6-7, Cirelli Dep. 32:19)

At some point in the fall of 2011, Leonetti directed Plaintiff to develop a budget for WBP's 2012 season. (PSSOF ¶ 4) Leonetti and Plaintiff informally discussed the budget at least one time prior to Plaintiff submitting his proposal, and Leonetti directed Plaintiff to help the City of Wildwood save money. (Cirelli Dep. 30:11-31:21; Leonetti Dep. 15:12-16) Plaintiff gave Leonetti a budget on December 16, 2011, that suggested removing three supervisory positions and adding ten lifeguard positions. (PRSOF ¶ 19, PSSOF ¶ 5) Leonetti told

3

Plaintiff in a January 2012 budget meeting that his restructuring proposal was "absurd," and Defendant Stocks viewed the suggested elimination of supervisory positions, including Stocks' position as Captain, as an attempt to fire Stocks. (DSOF ¶ 17, 21, Ex. 5; PSSOF ¶ 5)  Plaintiff claims he was attempting to comply with a directive from Leonetti to restructure the staff when he proposed his budget, but Leonetti denies that he gave Plaintiff any such directive.  (PSSOF ¶ 4; DRSOF ¶ 4)

Leonetti called a meeting in March of 2012 at Stocks' request.  (PRSOF ¶ 30)  At the meeting, Stocks provided Leonetti a list of concerns about beach patrol operations, including "no prequalification of guards, no background checks, no swimming tests, no records, no driving tests, [and] no evaluations of senior lieutenants."  (DSOF ¶¶ 27-28)  In addition, Defendants claim Stocks also presented a list entitled "Chief Cirelli Issues Summary 2012" ("DMSJ Ex. 6," Dkt. No. 23-9). (DSOF ¶¶ 25, 28)  This list names ten alleged deficiencies in Plaintiff's running of the beach patrol:

1. **WBPLA** Chief Cirelli solicits and spends thousands of dollars in donations made to the Wildwood Beach Patrol under the pretense of a "Lifeguard Association". He refuses to turn over the financial records for review.  No such "Association" exists.  He denies that WBPLA document came from the WBP laptop, despite credible evidence to the contrary.

4

2. **Uniforms** Chief Cirelli refused to follow a preseason directive regarding uniform purchases which stated, **"Reorganize uniform allocation. Lieutenants and Supervisors should not get guard uniforms. Limit surplus and purchase according to need."** Chief Cirelli has spent $4516.35 on guard uniforms. We now have a surplus of 70 shirts, 71 pairs of shorts, 37 pairs of sweat pants and 33 sweatshirts. He refuses to order uniforms for the supervisory staff.

3. **Operational Supplies** Chief Cirelli refused to purchase operational supplies that were recommended for the safety of WBP staff and visitors to the beach.

4. **VanDuvne Boatworks** Chief Cirelli misappropriated approx. 22k in WBP funds to VanDuyne Boatworks for unnecessary boat repairs. The WBP was informed by Tom VanDuyne that the lifeguard boats in question were not worth repairing. He offered an $800 credit towards a new boat for 3 WBP boats that were left in his yard for 10+ months. The WBP has 2 qualified boat repair experts currently on staff. Chief Cirelli's personal boat is presently stored at the VanDuyne boat yard and is scheduled for repair/paint. The WBP currently has 20 boats. The WBP uses 6 boats in daily operations.

5. **Documents** Chief Cirelli refused to submit 2011 documents that were required for operational planning.

6. **WBP Manual** Chief Cirelli violated the WBP Operations Manual in 6 specific areas in the 2011 season. See attached documentation.

7. **Work Schedule** Chief Cirelli has not been working a full schedule. He is taking unauthorized time off. He also refuses to notify WBP staff when he leaves or returns to the beach as policy and past practice. Often his whereabouts are unknown.

8. **Roll Call** Chief Cirelli refuses to attend WBP morning roll call at 9:30am. He misses important directives, announcements and instructions. He then complains that "no one tells him what is going on."

9. **Slander** Chief Cirelli has been attempting to discredit the Captain, Lieutenants and Supervisors of the WBP with slanderous remarks and comments to members of the public safety

community both in Wildwood and other South Jersey
towns.

10. **Maintenance** There is an obvious lack of effort
and leadership in the pre and post season
maintenance of WBP equipment. Furthermore,
several WBP vehicles have not been taken for NJ
state inspections. This should have been done
before 5/26/12.

(DMSJ Ex. 6)

Plaintiff agrees that Defendant Stocks presented a document
prepared with input from other senior staff members at the March
6, 2012, meeting but states that it "was a one page document"
that was "a list of 'Best Practices,'" not the two-page document
Defendants have since produced as DMSJ Ex. 6. (PRSOF ¶¶ 25, 28-
29) Plaintiff contends that "[i]t is unclear from the record
when [DMSJ Ex. 6] was exchanged and/or discussed between
Defendant Stocks and Defendant Leonetti," because it was not
discussed at the March meeting involving Plaintiff. (Id. ¶ 28)
The record does not appear to include the one-page document
allegedly presented at the March 6, 2012, meeting.

Stocks testified that he made this list at Leonetti's
request, but Leonetti testified that "he was unaware of the
purpose of the meeting, other than Defendant Stocks had asked
him to set up the meeting." (PRSOF ¶ 30) At this March
meeting, Plaintiff alleges that Leonetti was quiet but Stocks
asked Plaintiff, "[J]ust how long are you going to be hanging
around here?" (PRSOF ¶ 26)

The parties again disagree on dates, but at some point in early 2012, Leonetti told Plaintiff to concentrate on administrative duties and delegated operational duties that had previously been Plaintiff's responsibility to Defendant Stocks, who is "some 20 years younger than Plaintiff." (DSOF ¶¶ 22, 12) Defendant suggests that Leonetti reallocated Plaintiff's duties at the March 2012 meeting, where Stocks allegedly brought up a list of Plaintiff's deficiencies, but Plaintiff states that Leonetti downgraded his duties a few months earlier, approximately two weeks after the January 2012 budget meeting. (DSOF ¶ 31; PRSOF ¶¶ 22, 31)

Also at some unspecified point in 2012, prior to the WBP's Memorial Day opening, Leonetti approved rehiring Plaintiff for the 2012 season. (PSSOF ¶ 15, Leonetti Dep. 67:22-68:11)[1] After Plaintiff opened the season, apparently without any problems, he worked until his termination on July 24, 2012. (Leonetti Dep. 74:20-25) Prior to his termination, Plaintiff complains that he was shut out of the staff, because he was not included on the Beach Patrol website, in training information and forms given to new lifeguards (which only referenced Stocks as the supervisor), and among "NJSP Open Water Trained Responders" despite being so trained. (Pl.'s Answer to Defs.' Interrogatories, DMSJ Ex. 10,

---

[1] Plaintiff's start date was pushed back one month to May 2012, and his salary reduced to $25,000, in order to save money. (DSOF ¶¶ 33-34) He was not aware of whether anyone else's salary was also reduced. (Id. ¶ 33)

Dkt. No. 23-13 ("PADI") ¶¶ 4(c)-4(d), 4(i))[2]  In addition, Stocks allegedly "sent e-mails implying that Plaintiff was running the beach patrol improperly" and not responding to Stocks, and also communicated to local media that Plaintiff was "not on board with decisions of the beach patrol."  (Id.)  In what appears to be Plaintiff's last interaction with Defendants, Leonetti accompanied Stocks to retrieve an excess of guard uniforms, which Plaintiff had allegedly ordered in contradiction to a directive that supervisory uniforms be ordered instead.[3]  (DMSJ Ex. 6 ¶ 2)  Plaintiff states that Leonetti and Stocks "physically confronted" him but provides no further detail. (PADI ¶ 4(m))

On or about May 14, 2012, Plaintiff submitted a formal verbal complaint to Kimberly Hodsdon, Human Resources ("HR") Director for the City of Wildwood, alleging age discrimination and a hostile work environment and requesting mediation with Defendants Leonetti and Stocks.  (Id. ¶ 35; City of Wildwood Investigation Report ("Wildwood Report"), Dkt. No. 23-14 at 10) The HR director told Defendant Leonetti that Cirelli had complained, "but she was not specific," apparently regarding the

---

[2] He was also terminated the day before the annual beach patrol photograph. (PADI ¶ 4(n))

[3] Given that Plaintiff proposed a budget to cut supervisory staff, it is not clear whether his alleged refusal to order supervisory uniforms was in some way related to that proposal.  In any case, Leonetti was apparently too angry to ever discuss the matter with Plaintiff.  (Leonetti Dep. at 50:12-15)

basis of the complaint.  (Id. ¶ 38)  Leonetti did not speak with
Plaintiff or otherwise do anything in response to the HR
complaint.  (Leonetti Dep. 86:10-87:6)  Plaintiff also did not
speak with the city administrator or the city attorney about his
HR complaint; Plaintiff, now represented by counsel, and the
city's labor counsel each claim to have reached out to the other
but failed to find a time to meet.  (Id. ¶¶ 36-37; PRSOF ¶ 36)
Consequently, the City of Wildwood investigator who issued the
Wildwood Report, apparently in response to Plaintiff's
complaints, admits he never spoke with Plaintiff in putting the
report together.  (Wildwood Report at 4)

Having reached no resolution with Defendants, Plaintiff
filed a charge with the Philadelphia EEOC on July 11, 2012.
(DSOF ¶ 44; PSSOF ¶ 20)  Plaintiff received correspondence on
July 19, 2012, that confirmed to him that his charge had been
docketed; according to previous correspondence, receipt of this
July 19 letter indicated to Plaintiff that Defendants were also
sent a copy of Plaintiff's charge.  (PRSOF ¶ 45)  Plaintiff
asserts that he believes therefore Defendants (or at least
Defendant City of Wildwood) received a copy of the EEOC charge
on Monday, July 23, or Tuesday, July 24, 2012.  (PSSOF ¶ 23)
Defendants terminated Plaintiff's employment on July 24, 2012.
Leonetti, who claims he consulted no one else in making the
decision, denies seeing the EEOC charge until the day after he

9

had Plaintiff terminated.  (DSOF ¶¶ 47-48)  As justification for
Plaintiff's termination, Defendants point to the deficiencies in
DMSJ Ex. 6 and to Plaintiff's "proposed budget that would have
stripped the department of all its senior staff and which
Leonetti termed 'absurd[.]" (Defs.' Br. in Support of Mot. for
Summ. J., Dkt. No. 23 ("DMSJ Br.") at 12-13; DSOF ¶¶ 25, 28).

Upon termination, Plaintiff filed a second EEOC charge on
Aug. 1, 2012.  (PSSOF ¶ 25)  Plaintiff sought treatment on
August 4, 2012, for emotional distress and had apparently been
diagnosed with acute stress disorder and insomnia.  (PRSOF ¶ 55;
PADI ¶ 5)  Having received a right-to-sue letter from the EEOC
on August 26, 2013, Plaintiff timely filed his original
Complaint (Dkt. No. 1) on September 23, 2013.  (Id. ¶¶ 26-27)
One week later, Plaintiff sent a request to the Wildwood City
Clerk requesting that his pension be processed, which the
Lifeguard Pension Commission Members denied on December 18,
2013, "due to pending litigation." (Id. ¶ 31)  Plaintiff then
amended his Complaint on May 30, 2014, to include his claim for
retaliation in addition to his other ADEA and state law claims.
(Am. Compl., Dkt. No. 14)

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).

In deciding a motion for summary judgment, the court must
construe all facts and inferences in the light most favorable to
the nonmoving party. *See Pitney Bowes, Inc. v. Hewlett-Packard
Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999); *Boyle v. Allegheny
Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving
party bears the burden of establishing that no genuine issue of
material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S.
317, 322-23 (1986); *Novartis Corp. v. Ben Venue Labs., Inc.*, 271
F.3d 1043, 1046 (Fed Cir. 2001). A fact is material only if it
will affect the outcome of a lawsuit under the applicable law,
and a dispute of a material fact is genuine if the evidence is
such that a reasonable fact finder could return a verdict for
the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477
U.S. 249, 252 (1986). The court's role in deciding the merits
of a summary judgment motion is to determine whether there is a
genuine issue for trial, not to determine the credibility of the
evidence or the truth of the matter. *Id.*


### III. Plaintiff's State Law Tort Claims

"[P]arties suing public entities must comply with strict
requirements for notifying and suing those entities." *Johnson
v. Does,* 950 F.Supp. 632, 635 (D.N.J. 1997)(*quoting Feinberg v.*

11

*States, D.E.P.,* 173 N.J. 126, 134, 644 A.2d 593 (1994)).  To maintain an action against a public entity or public employee, the New Jersey Tort Claims Act ("NJTCA") requires a plaintiff to file a notice of claim with either the State Attorney General or with the department or agency involved in the alleged wrongful act or omission within 90 days of the accrual of the cause of action.  N.J.S.A. §§ 59:8-1, 59:8-8.

> A claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 of this act, may, in the discretion of a judge of the Superior Court, be permitted to file such notice at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby.  Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by section 59:8-8 of this act or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter; provided that in no event may any suit against a public entity or a public employee arising under this act be filed later than two years from the time of the accrual of the claim.

N.J.S.A. § 59:8-9.

Here, Plaintiff does not dispute that he has not filed a notice of claim with the City of Wildwood in accordance with the statute.  (Pl.'s Br. in Opposition to DMSJ, Dkt. No. 26 ("Pl.'s Opp. Br.") at 3-4)  Instead, Plaintiff contends that filing a claim with the EEOC, which was served on Defendant City of

Wildwood, supplied sufficient notice to satisfy the NJTCA.
(Id.)(*citing King v. Port Authority*, 909 F.Supp. 938, 947
(D.N.J. 1995).

The NJTCA notice requirement applies only to Plaintiff's
state law tort claims, not his discrimination claims.   *See*
*Forcella v. City of Ocean City*, 70 F. Supp. 2d 512, 514 (D.N.J.
1999) (applying NJTCA notice requirement to state law claims of
intentional and negligent infliction of emotional distress as
well as negligence but not discrimination claims brought under
Title VII of the Civil Rights Act[4], the Americans with
Disabilities Act, or the New Jersey Law Against Discrimination).
Because the EEOC complaint could only address Plaintiff's
federal discrimination claims, it necessarily could not put
Defendants on notice regarding Plaintiff's state tort law claims
of intentional and negligent infliction of emotional distress.
Moreover, even if the EEOC complaint had provided notice such
that "the public entity or the public employee has not been
substantially prejudiced" by Plaintiff's failure to file an
NJTCA notice of claim, Plaintiff has made no motion for

---

[4] "In the context of employment discrimination, the ADA, ADEA and Title VII
all serve the same purpose—to prohibit discrimination in employment against
members of certain classes. Therefore, it follows that the methods and manner
of proof under one statute should inform the standards under the others as
well.  Indeed, we routinely use Title VII and ADEA caselaw interchangeably,
when there is no material difference in the question being addressed."
*Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,* 60 F.3d 153, 157 (3d
Cir. 1995)

permission to file a late notice of claim nor provided any showing of "sufficient reasons constituting extraordinary circumstances for his" delay.

Plaintiff's citation to *King* is also inapposite.  King filed suit only two months after the accrual of his cause of action, and the court allowed King's state law tort claims pursuant to N.J.S.A. 32:1-163, a special provision in the NJTCA that allows suits against the Port Authority brought within one year of accrual.  Though the applicable provision here also allows suit within one year if granted permission by a court, nearly fourteen months elapsed between the accrual of Plaintiff's claim — his termination on July 24, 2012 — and the filing of his original Complaint on September 23, 2013.[5]

Accordingly, the Court will grant Defendants' motion for summary judgment on Plaintiff's state law tort claims.

## IV.  ADEA Claims

Plaintiff alleges age discrimination, hostile work environment, and retaliation against Defendant City of Wildwood.[6]

---

[5] Plaintiff's pension denial did not take place until May 30, 2014 (PSSOF ¶ 33), but given that he sought treatment for his emotional distress on August 4, 2012 (PRSOF ¶ 55), the Court assumes that his alleged state law torts of emotional distress accrued prior to that date.

[6] Plaintiff had brought ADEA claims against Defendants Leonetti and Stocks individually as well but has since acknowledged that "the ADEA does not provide for individual liability." *Hill v. Borough of Kutztown*, 455 F.3d 225, 246 n.29 (3d Cir. 2006)(citing Seventh, Fifth, and Eleventh Circuit

Because genuine issues of material fact remain, the Court will deny summary judgment on all three claims.

### a. Age Discrimination

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, term, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  To evaluate employment discrimination claims, courts use the burden-shifting framework set forth in *McDonnell Douglass Corp. V. Green,* 411 U.S. 792, 802-04 (1978). *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000).

> A plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination. . . . If a plaintiff establishes a prima facie case, [t]he burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the [adverse employment decision]. . . . If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . . determinative cause of the employer's action.[7]

cases).  (Pl. Opp. at 4)  Accordingly, the Court will grant summary judgment in favor of Defendants Leonetti and Stocks on these claims.

[7] *Stanziale* found it sufficient for plaintiff to show that "an invidious discriminatory reason was more likely than not a *motivating or* determinative

*Id.* (internal citations and quotation marks omitted).

### i. Prima Facie case

In order to first establish a prima facie case of discrimination, the plaintiff must demonstrate that (1) he is over 40 years old, (2) he is qualified for the position in question, (3) he suffered from an adverse employment decision, and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Hill v. Borough of Kutztown,* 455 F.3d 225 (3d Cir. 2006); *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013). The parties concede that Plaintiff is over 40 years old, that he suffered an adverse employment decision when he was terminated, and that his replacement, Defendant Stocks, is sufficiently younger than Plaintiff to permit a reasonable inference of age discrimination. The only remaining question, therefore, is whether Plaintiff was qualified for the position of WBP Chief. (DMSJ Br. at 4; Pl. Opp. at 6).

A plaintiff's "satisfactory performance of duties over a long period of time leading to a promotion clearly establishe[s] his qualifications for his job[.]" *Jalil v. Avdel Corp.,* 873

---

cause of the employer's action," *id.* (emphasis added), but the Supreme Court has since ruled that claims under the ADEA require a plaintiff to show that age was the "but-for" cause of the adverse action. *See Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 129 S. Ct. 2343, 2350 (2009)(refusing to apply the Title VII mixed-motive theory to ADEA claims).

f.2d 701, 707 (3d Cir. 1989) (finding employee qualified where
he had eight years of experience and was promoted to a "lead
man" position).  Here, Plaintiff worked his way up from being an
18-year-old lifeguard to WBP Chief over a nearly half-century
career, unmarred with any employment-related disciplinary
actions prior to the events giving rise to this suit.  (Pl. Opp.
at 5)  Consequently, Plaintiff was qualified for his position
and has established a prima facie case of age discrimination.

### ii. Legitimate Non-Discriminatory Reasons

To counter Plaintiff's prima facie case, Defendants proffer
legitimate, non-discriminatory reasons ("LNDRs") for terminating
Plaintiff's employment.  First, Defendants argue that Plaintiff
presented a budget plan that was deemed by his supervisor to be
"absurd."  (DMSJ Br. at 12)  Second, Defendants point to the
list of deficiencies in DMSJ Ex. 6.  (DSOF ¶¶ 25, 28)  Leonetti
indicates that he did not consider all ten items in DMSJ Ex. 6,
focusing instead primarily on the allegations related to the
WBPLA:  "[w]hen questioned about the fund [Plaintiff] controlled
relating to the beach patrol that the city did not know about,
[Plaintiff] stalled in responding to legitimate inquiries about
it," and it was this action, in combination with "continuing
deficiencies" that prompted Leonetti to fire Plaintiff.  (DMSJ
Br. at 12-13)

### iii. Pretext

Defendants having presented their LNDRs, this case now turns on the final step of the *McDonnell Douglas* framework: whether Plaintiff presented sufficient evidence from which a reasonable factfinder could either disbelieve the LNDRs Defendants proffered or believe that an invidious discriminatory reason was more likely than not the determinative cause of Plaintiff's termination.  If the aggrieved employee can raise sufficient evidence to discredit the proffered LNDRs, the employee need not come forward with additional evidence of discrimination beyond the prima facie case to survive summary judgment.  *Fuentes v. Perksie,* 32 F.3d 759, 764 (3d Cir. 1994) "[T]o survive summary judgment," a plaintiff has

> either (i) to present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the . . . proffered reasons for [the adverse employment action] (e.g., by painting them as weak, implausible, contradictory, or incoherent), or (ii) to come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a . . . determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons).

*Id.* at 765 (3d Cir. 1994)

"To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.*  As mentioned above, a plaintiff must show age discrimination was the "but-for" cause of the adverse action, not merely a motivating factor. *Gross*, 557 U.S. at 174.

The facts relating to both of Defendants' proffered LNDRs are heavily disputed, and the disputes are material to Defendants' motion.  First, Defendants argue that Leonetti terminated Plaintiff, because Plaintiff presented a budget plan that Leonetti deemed "absurd."  (DMSJ Br. at 12)  However, Plaintiff argues that he created this budget at Leonetti's express direction.  Moreover, Plaintiff's December 2011 budget proposal did not affect Leonetti's approval of Plaintiff's rehiring for the 2012 season.  (Leonetti Dep. 67:22-68:11)  On this evidence, a factfinder could reasonably disbelieve Defendants' articulated LNDR as the true motivation for Plaintiff's termination.  Because "plaintiff may . . . survive summary judgment by submitting evidence from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons," the Court will not grant summary judgment on the basis of this proposed LNDR.

With regard to Plaintiff's second LNDR, which focuses largely on the WBPLA allegation, Defendants argue that Leonetti terminated Plaintiff, because he "stalled in responding to legitimate inquiries" regarding "the fund [Plaintiff] controlled relating to the beach patrol that the city did not know about." (DMSJ Br. at 12)  Specifically, the WBPLA deficiency in DMSJ Ex. 6 alleges that Plaintiff "solicit[ed] and spen[t] thousands of dollars in donations made to the Wildwood Beach Patrol under the pretense of a 'Lifeguard Association'" and "refuse[d] to turn over the financial records for review."  (DMSJ Ex. 6 ¶ 1)

Plaintiff clarifies that the fund dealt with a beach patrol alumni association that was not actually associated with the City.  (Pl. Opp. at 6)  Defendant Leonetti admits, moreover, that when he asked Plaintiff about this account, Plaintiff turned over a checkbook and "[a]fter a while" all the books and records related to the fund.  (Leonetti Dep. 43:22-44:6) Leonetti also admits that he never reviewed the checkbook or conducted any forensic accounting.  Instead, he turned the investigation over to his police department, which never issued cause for any action against Plaintiff and apparently eventually lost the records.  (Id. 44:7-48:14)  Given Plaintiff's eventual cooperation with the investigation and Leonetti's lack of follow-through in determining whether any wrongdoing occurred, a reasonable factfinder could also disbelieve this proffered LNDR.

Consequently, the Court will not grant summary judgment on this basis.

In addition to evidence that may discredit Defendants' LNDRs, Plaintiff has also offered sufficient evidence of discriminatory animus to survive summary judgment.  A plaintiff can support a claim of such animus "by showing that the employer in the past had subjected him to unlawful discriminatory treatment" or "that the employer treated other, similarly situated persons not of his protected class more favorably." *Fuentes*, 32 F.3d at 765.

Here, Plaintiff argues that Defendants "subjected him to unlawful discriminatory treatment" by reducing his duties and otherwise shutting him out of staff responsibility, while at the same time, treating Stocks, a "similarly situated person[] not of his protected class more favorably," giving Stocks duties that ostensibly belonged to Plaintiff and promoting him into Plaintiff's position once Plaintiff was terminated.  Stocks also asked Plaintiff, "[J]ust how long are you going to be hanging around here?" at the same March 2012 meeting where he presented the "multi-page list of Cirelli's deficiencies" which Defendants now argue were "sufficient for Leonetti, essentially, (sic) [to] put Stocks in day-to-day control of the department."  (DMSJ Br. at 12, DSOF ¶ 31)

Viewing the facts in the light most favorable to the non-moving party, a rational factfinder could conclude from the evidence presented that age discrimination was the but-for cause of Plaintiff's downgrade in duties and his termination.  As a result, the Court will deny Defendants' motion for summary judgment on Plaintiff's age discrimination claim.

### b. Retaliation

Genuine disputes of material facts also remain regarding Plaintiff's claim for retaliation.  "In the absence of direct evidence of retaliation, retaliation claims under . . . the ADEA . . . typically proceed under the *McDonnell Douglas* framework." *Fasold v. Justice,* 409 F.3d 178, 188 (3d Cir. 2005).  A prima facie case of retaliation under the ADEA requires the plaintiff to show that (1) he engaged in a protect employee activity; 2) he was subject to an adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse action.  *Id.*  A short temporal proximity between the protected activity and the adverse employment action supports an inference of causal connection. *See Jalil v. Avdel Corporation,* 873 F.2d 701 (3d Cir. 1989)(reversing summary judgment in favor of defendant where discharge occurred only two days after employer received notice of plaintiff's EEOC claim).

Plaintiff sets forth a prima facie case for retaliation. He engaged in a protected activity when he complained to HR[8] and again when he filed a claim with the EEOC; he was undoubtedly subject to the adverse employment action of being fired; and while the exact date that Leonetti became aware of Plaintiff's complaint is not clear, it is undisputed that Leonetti fired Plaintiff within a day of the City of Wildwood receiving notice of Plaintiff's EEOC filing.  Defendants contend that Leonetti was personally unaware of the filing, but this fact is disputed, and in any case, Leonetti was at least aware of Plaintiff's verbal complaint to HR just two months prior to his termination.

As a result, the Court finds that genuine issues of material fact remain regarding Plaintiff's retaliation claim and will accordingly deny summary judgment.

### c. Hostile Work Environment

Hostile work environment claims require a plaintiff to prove that the "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of . . . employment and

---

[8] *See Alred v. Eli Lilly and Company,* 771 F.Supp.2d 356, 365 (D. Del. 2011)(finding a complaint to HR as a protected employee activity).

create an abusive working environment.'" *Culler v. Sec'y of U.S. Veterans Affairs,* 507 Fed.Appx. 246, 249 (3d. Cir. 2012).[9]

Here, Defendants made specific comments urging Plaintiff to retire. They downgraded his duties, phasing him out of his previous responsibilities, and ultimately terminated his position, without minimal effort to resolve the issues raised. In addition to this series of negative personal interactions, Leonetti demanded and turned over for police investigation financial documents related to the WBPLA account that Plaintiff maintained. In his deposition, Leonetti argues that only Plaintiff signed the checks related to this account, in violation of a city rule that requires that the City of Wildwood CFO sign them as well. (Leonetti Dep. 46:9-25) However, there is no evidence that Leonetti believed Plaintiff was diverting funds to his own, personal purposes, or otherwise engaging in criminal conduct. Nonetheless, in recommending a police investigation, Leonetti inexplicably attempted to criminalize conduct that he believed, at worst, may violate a civil municipal regulation. It is particularly difficult to infer that Defendants actually suspected criminal activity, given that the police department (which Leonetti also supervised) lost the

---

[9] The Third Circuit has assumed that the ADEA makes available a hostile work environment claim for age-based discrimination similarly to a Title VII claim. *Slater v. Susquehanna County,* Fed.Appx. 132, 138 (3d Cir. 2012).

records Plaintiff submitted, did a minimal investigation, and never brought charges.

Based on these facts, the Court will deny summary judgment on Plaintiff's hostile work environment claims at this stage.

### V.   Conclusion

For the reasons set forth above, the Court will grant Defendants' motion for summary judgment in part and deny it in part.  An appropriate Order accompanies this Opinion.

Date: August 19, 2015


                s/ Joseph E. Irenas
              **JOSEPH E. IRENAS, S.U.S.D.J.**